All right, our third case for this morning is Daza v. State of Indiana. Mr. Darst. Good morning, Your Honors. May it please the Court. Good morning. Plaintiff Peter Daza was a highly rated geologist in the Indiana Department of Transportation, which we call MDOT. Daza complained about political discrimination he was repeatedly retaliated against, culminating in his termination. The political discrimination decision of Yankee v. Kane County, Illinois held that an ambiguous statement relating to animus, plus the failure to follow a recommendation for a lesser punishment that was available, is sufficient to deny summary judgment. In Peter Daza's case, he has evidence of numerous statements of animus relating to political discrimination. Can you explain to me why or how you link together Mr. Daza's efforts to recognize his employee, Mr. Goff, and political discrimination against Mr. Daza personally? Because certainly if Mr. Goff has a cause of action for discrimination based on his political affiliation, nobody prevented him from bringing that. So how do we work this over into something that happened to Mr. Daza? This was not only discrimination against Mr. Goff, but also Mr. Daza, because Mr. Goff was Mr. Daza's employee. But maybe parts of it, but I think things like the complaint that the promotion went to somebody else, and he sent some emails, and even the fact that although Mr. Daza thought Goff deserved an outstanding rating, he only gets the next notch down, exceeds expectations. Why is that any kind of adverse action against Mr. Daza based on his alleged affiliation with the Democratic Party? First of all, they don't have to be adverse actions in order to be evidence of animus of political, excuse me, evidence of political discrimination animus. So that's what we have here, is evidence over and over and over again of political discrimination and political animus. So, for instance, for the involvement of Mr. Daza, one of the first things that happened was that Mr. Daza was asked by NDOT Director Shane Spears to find out what Mr. Goff's political statements were on Facebook, supporting Mr. Goff's family friend who was candidate for governor. This places Mr. Daza in the awkward situation of having to participate in political discrimination himself by trying to find out what political statements his subordinate has engaged in, which is very difficult for him to do. What is he supposed to do, go ahead and participate in the political discrimination, refuse to participate in the political discrimination? It's a terrible situation that Mr. Daza was placed in from the beginning. So you think there's discrimination anytime somebody even asks, you know, hey, do you like to go to the Republican Party events, or you consider yourself a Democrat? No, this was a statement from the director, a director of NDOT, stating that the HR manager, Helen Raines, who supervised promotions of Goff and other, all the other people at the Vincennes District, wanted to find out what political statements Goff was making on Facebook about the candidate for governor. All right, so let me just back up. I mean, I understand your, I mean, you seem to have kind of an atmospheric claim, but the things that happen to Daza, he gets a reprimand associated with his cell phone policy. He has maybe an unpleasant encounter when Goff doesn't feel able to do snow plowing duty, and he doesn't go through the progressive discipline. Maybe that's something concrete that you can focus on. They've created a file on him indicating that they think his attitude is very bad. Everybody recognizes throughout this that he's a superb geologist. Correct. Nothing whatsoever about that, but I'm sure you're not taking the position that an employer, including a state employer, can't take somebody's ability to work with others into account, even if they're superb at what they do. Oh, certainly, Judge, that's absolutely correct. And he was rated highly on that year after year after year. The only time he was not rated highly and was only rated as meets expectations was the year that he supported the complaint of Mr. Woodruff's, against Mr. Woodruff for political influence in land sales, and then within a month after that, he was given the only discipline he had in 22 years, and the excuse was used, the pretext was used. Well, we told you to carry your cell phone, and there was no requirement, state requirement for him to be on emergency call like snowplow crews or emergency road crews or anything else. There was no requirement for an emergency geologist. He was asked to carry the cell phone, though, wasn't he? And he did, but he complained first, this is not, this is against state policy. This is not right. You're giving me duties that are not right, and I don't even have duties, emergency duties, after hours. Why should I have these additional duties? Right. So he complains, and he also sits there in these training sessions communicating through body language and otherwise that he thinks they're a waste of time. No, Your Honor, he is not. That's a disputed fact. He had 22 years of training where he was never criticized about his training until after his mother's letter to the editor opposing the governor's position on Syrian refugees, which was a very hot topic at the time. So I remember that was a hot topic in Indiana and elsewhere, but particularly with former Governor Pence. But where's the evidence that Mr. Fowler knew that that was his mother who wrote the letter? Mr. Fowler had discriminated against Mr. Goff and Mr. Daza for years. Does that mean you know his mother? Oh, yes. That's Mr. Daza's closest relative. He's not married. That's his closest relative, his emergency contact. She was involved in Democrat politics and was appointed to state commissions. But is there evidence in the record that Mr. Fowler – I thought Mr. Fowler said he didn't know. So what's the evidence in the record, other than sort of must have known, that he did know that the woman writing this letter was Mr. Daza's mother? And by the way, why would he care what Mr. Daza's mother thinks? Well, why would the governor care? Mr. Fowler is the governor's appointee. Mr. Fowler follows the directions of the governor, follows the wishes of the governor, follows the inclinations of the governor. Everyone who's a governor's appointee would care about what the governor was interested in. But let me go back. The more important thing is that for years, Mr. Fowler and his employees retaliated against Mr. Goff and Mr. Daza. And Mr. – by 2014, Mr. Fowler had even wanted to terminate Mr. Daza. And the HR manager, Daniel, said, well, here are steps that we should follow. Oh, right, yeah. And they didn't follow any of them. So Mr. Fowler had already made up his mind when Ms. Cockram, who knew about the letter to the editor and the governor's opposition to it and had received then three allegations against Mr. Daza in rapid succession just after the letter to the editor, she jumped on board and said, okay, well, let's give him a suspension. This gave Mr. Fowler then the opportunity to say, I'm not going to suspend him, I'm going to terminate him, which I wanted to do back in 2014. So it really didn't matter whether Fowler knew in 2015 whether – of the letter to the editor, which was a public matter or not, because he'd already made his decision in 2014. And Ms. Cockram, who knew about the letter, had recommended and said, finally, okay, I'll jump on board and be a team member. As you said, everyone wants to be a team member. I'll be a team member. Okay, you might want to save a minute for your rebuttal in terms of – Where's this district? This is in the Vincennes District of southern Indiana. So you were asking about Mr. Daza's attitude, and I will tell you that he was rated very highly on his attitude, teamwork, accomplishments, spontaneous compliments, everything, except when they wanted to retaliate against him. He was rated – he passed all of the trainings and even went to southern Indiana University to a management class, passed that, no problems. But after the letter to the editor, then days after the training, they say, oh, we also say he's disinterested. He was never disinterested. He was never rated as disinterested. He was a very good employee in all respects. But he complained about discrimination. And the written document from Woodruff said – Okay. I'll give you an additional minute if you need it. Mr. Ellis. Thank you, judges. The defendants, the state of Indiana, Russell Fowler, Valerie Cochran, Anita Daniel, respectfully request the court affirm the entry of semi-judgment of Mr. Daza's claim for First Amendment political discrimination retaliation for very simple reasons that the state, through Rusty Fowler, was motivated to terminate Mr. Daza's employment solely as a result of his misconduct. But, you know, this all comes up out of nowhere. It's a little fishy that Mr. Daza isn't given the benefit of the usual progressive discipline. There's all of a sudden this jump to firing him when everyone agrees he does the job well, that he's been hired to do. Of course, we're supposed to take the facts in the light most favorable to him. But even putting some facts that the state has drawn together, maybe he's displaying, at least some people in the management are perceiving that he's displaying an insubordinate attitude. But chopping his head off as opposed to giving him a few days off to reflect on what's going on seems very strange. And he presents evidence that it's because it really seems to stress very much his espousal of Mr. Goff's association with the Democratic Party. Respectfully, Your Honor, the record does show that there were struggles, certainly with the senior management in the Vincennes District, Mr. Daza, for quite some time leading up to his termination. It was not a sudden change of position. He was reprimanded for insubordination in 2013. That's March 8, 2013. He gets a reprimand on the cell phone business. But that apparently resolves itself right away. I mean, I don't know how long you're supposed to hold a grudge about the cell phone, but he does it. The cell phone itself was not the basis for his termination, but it shows that at least as far back as 2013, there were certainly issues with management and Mr. Daza for which he was sued. One trivial issue. Yes, I know it hasn't been there, but you've got to keep your cell phone for some other reason. We've just decided if it's a state, it wasn't like his personal cell phone. It was a state-issued cell phone. Indeed, it was a state-issued cell phone. And the issue wasn't simply that he was refusing to use the phone, but it was that he had gotten up in front of both employees and independent contractors and said publicly that he wasn't going to comply with this policy. And Mr. Daza is a person who is in a supervisory role. It created problems for management in terms of maintaining order within the workplace. And then nothing happens for a full year other than a report in the Indianapolis Star about Mr. Woodruff's profiting from the land sales. It's not until a year later that Daza is defending Goff for not coming in to plow. I don't know that it's accurate, Your Honor, to say that nothing happened through the course of this time. Well, nothing in this record. Certainly nothing that has occurred within the record, but the record also shows that in the spring of 2014, Rusty Fowler and certain other decision-makers, including Mr. Daza's then direct supervisor, were fed up with Mr. Daza's attitude. They felt that he was usurping the authority of his supervisors, and they felt that he was most likely not salvageable even as far back as 2014. So this is 2013. But there's no basis for it. I mean, you know, the question is that they have no basis for that. There's some email, basically, where they say we haven't papered the record on this. But Mr. Daza says, well, it's actually this, you know, you're putting all these highly placed Republicans in these things. I'm a known Democrat. I'm supporting Mr. Goff, also a known Democrat. You know, you're just trying to purge the department of politically unfavored people. He has indeed made comments of that sort as long ago as far as the record reflects, in 2011. Now, there's no comments really in 2014 or any showing that there were any further complaints after 2011 that Mr. Daza felt that he was or anyone else was being passed over as a result of their political affiliation. It's simply too remote in time to suggest that the things that were happening in 2013 and 2014 and then ultimately his termination in 2015 had anything to do with a couple of emails, which, by the way, were only exchanged between himself and Director Cockrum, not any other person such as the ultimate decision maker, Rusty Fowler, to indicate that Rusty Fowler wouldn't be in any way motivated by these private email exchanges, which were. So can you tell me about the evidence that would indicate that Fowler knew that it was Mr. Daza's mother who wrote this letter to the editor? Yes, Your Honor. There is no evidence that Mr. Fowler either knew that. She has a different surname, I know. She did, Your Honor. Her name is Marjorie Melvin. So just by reading the letter to the editor, there would be no reason to believe that there was any relation. But more importantly, Deputy Commissioner Fowler has testified that he didn't even know of the letter at all until after he had made the termination decision. So there's no way that the letter itself could have influenced the decision to terminate the employment. It was instead— Does the record reflect Mr. Fowler's political party affiliation? No, Your Honor. The record does not reflect the political affiliations of any of the defendants. But it does reflect that Mr. Daza has testified that he's never heard any of the three of them make any kind of adverse comments about Democrats or liberals or persons who may not be affiliated with the Republican Party. So there's simply no—there's no reason to believe that any of them were motivated by an anti-Democrat or an anti-liberal bias. Counsel, should I make any difference or anything about the fact that the Solicitor General is not involved in this case? I don't think it makes any difference, Your Honor, that the Solicitor General is not involved in this case. This is an ordinary employment lawsuit that's handled by the Government Litigation Section. That's sort of the switch off if employment law goes to you. It does, in fact, go to the section of which I am a part, yes, Your Honor. I mean, if he wanted to, I assume he could, right? Yes, if the Solicitor General chose to involve himself in this case— I'm sure he's not particularly looking for work. I was assuming he was busy, but yes. I would be happy to accept his help if he felt it was important or within his bailiwick. How many districts are—endowed districts are there, do you know? I don't know for certain, Your Honor. My understanding is five or six. One of the most southern districts, but it is separate from the central office, which is the Indianapolis district, which includes the overall endowed leadership. So none of the reasons that were given in Rusty Fowler's termination letter have been genuinely disputed by Mr. Daza, and Mr. Daza has not been able to connect up any of the alleged protected activities with any kind of discriminatory animus. The worst thing he points to, I think, is the failure to use the progressive discipline, which causes one to say, well, viewing the evidence in the light most favorable to him, did that come about for an acceptable reason, such as insubordination or the like, or did that come about for an unacceptable reason, i.e., his political affiliation? Respectfully, I disagree that there was no form of progressive discipline that was involved in this case. Mr. Daza was, in fact, issued a written reprimand for insubordination in 2013. But that was two years and a half before he was terminated. The state would be quick to argue that that's too far to draw any kind of an inference in any other circumstance. But as we know from the record, there were continuing issues. In 2014, there was a meeting with Director Cockrum, Deputy Commissioner Fowler, and Mr. Daza's then immediate supervisor to discuss whether or not Mr. Daza was salvageable. So certainly it was still on the mind of the state at that point in time. And Mr. Daza was expressly warned in his written reprimand that further instances of insubordination or other misconduct could lead to other discipline up to and including termination. So two and a half years later, you're supposed to keep a letter. You get a written reprimand in March of 2013. March of 2014 comes and goes. March of 2015 comes and goes. And finally, at the end of December in 2015, you get terminated. You're supposed to realize that this is a blot on your record for that amount of time? I think that most employees would still recall that they had been issued a written reprimand within the last couple of years. But regardless, the application of the state's progressive disciplinary policy is within the discretion of the managers. And clearly we know from the record that the State Personnel Department felt that further discipline was warranted, including two of the defendants. But Deputy Commissioner Fowler determined that in light of his prior behavior and the fact that there had been three instances of various types of insubordinate behavior within seven days leading up to his termination involving multiple directors at NDOT as well as outside trainers from another state agency, he felt that it was within his discretion. NDOT has permanent employees and then seasonal employees, does it not? May I answer? Yes. My understanding is that NDOT does have regular at-will permanent employees and they do have seasonal employees. Yes, Your Honor. And for the seasonal employees, is there still a requirement that they have a particular sign-off by the President Committee? With regards to seasonal employees, Your Honor, that's beyond the scope of the record and it's beyond my personal knowledge as well. I'm sorry, I can't answer your question. Are there no further questions? All right, thank you. Thank you, Judges. So I said I would give you a minute, Mr. Darst. Thank you. In answer to Judge Kaney's question about sign-offs by precinct committeemen, that was, I believe, for hiring, but the system in Indiana was that there should be no political discrimination after hiring and promotion and allocation of roads and bridges and that kind of thing. Now Judge Wood asked about the attitude of Mr. Daza, and he was always complimented by everyone except those when he complained about political discrimination. For instance, Appendix 60, his manager says, I always appreciate your total honesty, Pete, and your support for Terry is commendable. And he always was complimented by his manager on that until she wanted to get on board. Even when he was terminated, his supervisor, Bill Tompkins, supported him and said he should not be terminated, he should be in that position. And you had asked about the statements of Fowler and Woodruff, and those statements at Appendix 167 and 168, Woodruff says, Goff constantly complains, and Fowler says it's about politics. And they say, Woodruff says, go ahead and lower Daza's recommendation or rating of him, which costs. About Goff, yeah. Goff and costs Daza the promotion of his employee. Then at page Appendix 126 in 2014 July, Goff again confirms that he's been complaining constantly. And then you ask about the politics of Daza at Appendix 209 attached to the reply brief. Daza said their issue with me, main issue, is because I'm a Democrat. I defended one continually from persecution all the time, and they got sick of me doing that. Okay. I think we'll have to leave it at that. So he was supported by everyone except by Fowler and Woodruff, who was directing Fowler and people who were trying to retaliate against him for complaining. All right. Thank you very much. Thanks to both counsel. We'll take the case under advisement.